Thank you. May it please the court, I'm Brooks Cutter and I represent the Appellant Relator here at the Dan Abrams Company along with my daughter Selene Cutter who will be handling the rebuttal. This is a case in which this court is asked to uphold a district court finding that no false claims act case was pled where the defendant deliberately made and sold an unapproved class 3 device for a contraindicated use. Medtronic did not get these products approved by FDA but instead went through the far more cursory 510k clearance process. Medtronic said these are just like our other mid and lower back devices. For the avoidance of doubt Medtronic not FDA wrote a label for the products it issues saying the devices are contraindicated for use in the neck at the cervical level. Counselor if I understand the law correctly if the device was unapproved and should have been a class 3 device then wouldn't it be a false claim to submit for reimbursement on that fact alone? It doesn't matter whether it was contraindicated or not. That's correct your honor. I think we have two paths here that succeed in the alternative. So here Medtronic then turned around and manufactured and delivered devices to hospitals across the United States that could only fit in the contraindicated cervical spine level and used their well-known cervical brand name of Cornerstone. The real fraud then occurred in the hospitals. Medtronic trained doctors and provided tools to do the surgeries in the cervical spine leading the hospitals and doctors to believe that they were buying and implanting FDA approved devices for cervical use. Counsel one of the things that confused me was the different sizes of the device and I couldn't figure out why wouldn't a trained orthopedic surgeon know the difference just based on the size alone? That's a great question your honor and the what they didn't know was the status of the device. They knew that it was clearly a device that would fit in the neck and they were using it for that. If you look at ER 357 that's and even if that's an off-label use assuming it's otherwise appropriately approved for some use that would be okay would it not? It would not because here it's uh this is not what the defendant is trying to portray as garden variety off-label use. What this is instead is a case where there's no medical judgment about whether this is off-label or not being made at all because the surgeons all believe this was a question. That's the question I'm asking is there is a certain amount of medical judgment inherent is there not in the surgeon's decision to go forward with the procedure utilizing the Medtronic's device that's being handed to him by the sales rep in the operating room. Absolutely your honor if they believe if they are making that the the entire practice of medicine off-label use exemption contemplates a conscious decision by the physician to engage in that practice. That's not what happened here at all. But it seems to me I could agree with you on part of your claim that the district court was wrong but then I could also be of the view I think what like Judge Tallman is saying that uh that doctors have discretion to use a medical device for a indicated purpose and I haven't seen any case to that to the I don't know what your best case would be on that and that also uh accepted standards of medical practice so I could see I don't think it would be inconsistent for me to feel that one of your claims doesn't make it but then on the uh claim regarding class two and class three that you might be right. I hear what you mean. I mean is that legally inconsistent do I have to do I have to do I have to bite the whole apple? No I don't think or could I say no the district court was right on on in part but where the district court may have erred say for example would be that uh you seem to contend that I uh well there's a campy area and campy seems to state that you can't take state a claim um in that area. So I guess that's what I'm trying to I'm trying to say if I if that's what and I don't know that that's where I'm going we haven't conferenced on this I'm not speaking for other people but I'm wondering if you find that legally consistent that we would have to agree with you in total or we could agree in part and still be legally consistent. Right I think that you could absolutely proceed in the alternative because a class three VBR device that required a full PMA to be sold but was sold without that is an adulterated device and and you don't have to get into the whole medical judgment off label use area. If you look at 21 CFR 888.3080 which they rely on it's only a few paragraphs and it talks only about fusion devices not using manufactured bone being class two that's not what we're talking about here. These are load-bearing devices that replace the entire vertebrae in the neck. If there are any doubt about this it's confirmed by 21 CFR 888.3015 which says that VBR products made of bone are class three. If you think about it why would FDA regulate those as class three something using natural bone and and then say ah but if you're going to make it out of plastic or something else don't worry about it that's class two. They've never done that and that's not so these are clearly adulterated devices that Medtronic's manufacturing and selling. I'm still kind of hung up though on on what role medical judgment plays in in the fraud analysis because I'm assuming that you're going to be able to prove that CMS paid for virtually all of these claims and I assume it did so because it relied on the medical judgment of the surgeon that these were necessary and efficacious for the use to which the surgeon put them. I think that it's an independent prong here that Medicaid was not aware of the Medicare would not have been aware of which is because of the coding they would not have been aware that what were in fact paying for were adulterated devices. So setting aside the adulterated device piece I don't think the coding issue is a separate issue. I've had CPT code cases before I understand coding but but again regardless of what CPT code the claim was submitted under I'm really hung up on this notion that that the doctors were just duped in a way that I wouldn't expect an orthopedic surgeon to be duped if he or she had any experience doing these kinds of operations. So let me try and clarify that your honor the the point what they were not duped about these were what Medtronic made were these adulterated devices that fit perfectly in the neck but they were unsafe and untested and and hadn't undergone the rigorous PMA analysis. That was the piece that the doctors trusted Medtronic. They've been partners with Medtronic for years so when when the Medtronic rep shows up in the OR unboxes takes off the labeling and gives to the scrub nurse a device that fits perfectly in the neck their orthopedic judgment is okay this is an approved tested device that I can use. I'm of my medical judgment that's the piece that was wrong. Are these devices now approved for use? No they aren't. They are not. Okay. So is the false statement to the FDA that the device that were that the device that goes in the neck that they told the FDA that it couldn't go in the neck is that what what's the false statement to the FDA? Well there are two false statements here. One is that these are substantially equivalent right because they're not. Their device is made for an entirely different level of the spine. So that's the first false statement. On that point is your allegation that the FDA just didn't realize that because you know obviously the shape would be different from the neck versus lower back and when Medtronic came to the FDA and said they're substantially equivalent what's the theory behind that they just didn't recognize this? What we have in the record is just a very simple short letter from Medtronic summarizing the substantial equivalence doesn't include photographs or sizes and it just says we're making these for the thoracic lumbar spine. They're contraindicated for the neck so they didn't leave room for FDA to question it at all. They said no no they're contraindicated and so you know why did Medtronic manufacture and sell a contraindicated device? That's a question to answer in discovery. There's no conceivable answer. Is the only clue the FDA had the dimensions of the device? It's not clear exactly what they had in the 510k approval process that we haven't. I thought I read something in in the 510k approval papers that actually gave dimensions of these devices. Did I not? It's in the letters or an exhibit purposes of my question that that information is in in the application. Is it your position that the FDA was the FDA would have to have realized that that was either too large or too small a device for the part of the spine that it was no I don't think they would have at all because these are it's a it's a very the substantial equivalence is not an approval process at all. It's taking the manufacturer's word that they are making something for a particular part of the spine and especially where Medtronic says in black letter writing contraindicated for the cervical spine. So your position is that size dimensions alone would not have been enough to put the agency on notice? No I don't believe they would have because you also have people of many different sizes children to adults and and those simple dimensions alone are clearly not particularly when Medtronic's combining it with a false falsehood to the to the agency if these are contraindicated. So I will uh let me find out before you uh that's fine uh do either uh Judge Lee or Judge Coleman did you have any additional questions of Mr. Cutter? I do not at the moment. All right thank you. Thank you. Good afternoon. Good afternoon. May it please the court. Doug Hallward-Dreemeier on behalf of the Medtronic defendants. After four tries and an opportunity for a fifth later still fails to plead the central element of FCA liability which is a false claim for reimbursement. Instead as we've just heard the later attempts to plead arguments of regulatory violations before FDA that are not the standard for reimbursement to CMS. And let me ask you this let me take you to what I was struggling with. Like your brief seems to contend that fraud on the FCA where the FDA is aware of the alleged misrepresentations made in the approval process and has not taken any action in response. Can you help me square that position with the statement by this court in United States uh uh Campy versus the lead sciences that says that mere FDA approval cannot preclude false claims act liability. That I absolutely that that is true. Mere FDA approval does not preclude FCA liability. But what we have here is very different from Campy and would be something that no court of appeals has ever done and several court of appeals have explicitly rejected. Which is Campy the first let me characterize Campy. Campy was about uh non-conforming goods. FDA had approved drug A. The company was selling drug B claiming it was drug A. So the fact that FDA had approved drug A did not mean anything. In Campy there were actually two sets of allegations right. There was one that they were getting ingredients from Chinese factories even though they said they weren't from China. But then there was the other one where they claimed they later got approval for the ingredients from the Chinese factories but hid safety reports. So under those set of facts isn't that didn't our court essentially allow a type of fraud on the FDA claim? What the significance of those allegations about the later approval is that the defendant was thought this Chinese facility was fine. So even the earlier drugs made in the Chinese facility were were fine and eligible for reimbursement. And what the court said is well wait how can we know that for that purpose when the allegation is that you misrepresented to FDA the quality coming out of that Chinese facility anyway. And FDA had taken enforcement action on the basis of that and the product had been removed from the market because of those impurities. So in all of those circumstances this court said that the jury and the trial court would not be asked to second guess what it was that FDA had done. This however is a very different case. In this case reimbursement under the applicable Medicare guidelines requires two things. One that the device have been cleared. Two that its use is medically necessary being consistent with standards of medical practice. Relator does not want to fight on the second of those which is the standards of medical practice. There are no allegations about that other than their own acknowledgement that these products were the leading products used. But counsel if the clearance by the FDA was obtained by fraud inducing the agency to think that it was approving something that was substantially equivalent to a class two device when in fact the device was manufactured and could only be used for purposes that were covered by class three. Why wouldn't that be a viable claim of fraud on the agency which then triggered the reimbursement from CMF? Well what that is in fact what a relator proposes to ask six lay individuals to decide that FDA's approval is for not and meaningless under the regulatory regime. But FDA which has known about these allegations since at least 2009 at least since 2015 has taken no action against these devices. And that's what the first circuit recognized in D'Agostino and in Nargal cannot be the role of six lay jurors to decide that FDA's clearance and approval should be rendered obligatory for purposes of reimbursement under CMS. But counsel why couldn't a district court properly instruct a lay jury that the FDA considers any devices manufactured for the three medical devices and then tell the jury if the defendant submitted such a device under the guise that it was simply substantially equivalent to a class two device well knowing in truth and in fact that it could only be used on the cervical spine which makes it a class three device that that constitutes fraud on the agency. Because your honor there are several problems with that let's start with the first. The congress made clear in the in the FDA act and in the Medicare act that neither FDA nor Medicare governs the practice of medicine. I think your honor asked that question earlier and that is so as soon as it is cleared for and lawfully marketed it's up to the doctors to decide how to use. Now this device. But I don't see how you say you I don't know what you it seems inconsistent to me that you say that the doctors can reasonably utilize these devices in a certain way but then you tell the FDA that it's unsafe that it was not safe to use it that way but you say then the doctors can be an influence like you're talking out of both sides of your mouth. Your honor that the statute this is 21 U.S.C. 396 says that FDA does not control the way in which doctors use devices once they've been cleared for use that is not FDA's authority. The contraindication which was how the product's use had become standard by 2009 which is the statutory period here statute of limitations. By 2009 the cornerstone PSR product was the number one selling cervical implant and this is according to Relator's own evidence. You're arguing prong two when our questions are prong one. Prong one is that it has to be cleared for use and I haven't heard I haven't heard a convincing answer from you yet as to why the FDA would have cleared this device as a class two substantially equivalent medical device without requiring Medtronics to go through the PMA process which is substantially more time consuming and expensive in order to get class three authorization for a device intended to be used only in the cervical spine. Okay so let's go to the several 510k clearances that are in the record that are in the exhibits. Exhibit 10 for example is the 2002 510k clearance. Exhibit 12 is another 2003 510k clearance. Each of these and each of the additional ones there are many there are some I lost count I think there are 10 510k clearances in the record. Each of them clear clears the product under either 888.3060 or 888.3080. Most of them the the real focus of the allegations are with respect to VBR the replacement of a vertebrae with one of these devices. VBR device was cleared in 2003 as a class two device under this provision 888.3060. 888.3060 does not distinguish between thoracolumbar devices and cervical devices. There's no reference in that provision to where it's located. We have provided for the court to take judicial notice of additional clearances. These are not in the record but they are government documents of which the court can take judicial notice for new basis product and for Medtronic's own t2 stratosphere product which are cleared under class two same provisions for use in the cervical spine. There is no categorical distinction between class two and class three depending upon whether it's cervical or thoracolumbar. Well let me ask you this then if if we were to find that the plaintiff adequately alleged that certain of the inner vertebral body fusion devices that issue contained bone morphogenic proteins and thus should have been classified as class three devices should we reverse the district court? No your honor because they're not alleging that the the that that characteristic was not disclosed to FDA. They don't say that that characteristic was hidden from FDA and it's similar to the allegation with respect to the space. They say the doctor would immediately recognize that because of the dimensions it's for the cervical use. Judge Talman you're absolutely correct that the record shows that the dimensions are part of the 510k application and that is at pages er 678 to 707. One specific 510k document that's in the record is at er 657 in which the application calls out explicitly an 11 millimeter by 11 millimeter device and says that this is the device that we have done our specific testing of its of its durability because it's the smallest diameter and so it would be the perhaps the weakest. So it calls out 11 by 11. Relator said with respect to 11 by 11 and this is again at er 657 these are relators notes that are appended to that document says that this only fits the cervical spine. Well your honor that fact was called out in the application that it was 11 by 11 and relator wants to say that device is effectively not lawfully marketed by Medtron. They want to ask a jury of six individuals to negate the clearance that FDA has given and again these allegations have been before FDA for at least five years. DOJ declined to intervene in this case. FDA has declined to take any action against Medtron. These are precisely the circumstances in which the Supreme Court in an individual relator who gets it wrong about the regulation. We have in the record all the 510k applications for the various devices? They did not append all of the 510ks. There are several of them that are in the record. All of the ones that are in the record show that the devices were cleared as class 2 devices and again we've been so talking about FDA regulation and that's of course where we know relator wants to talk because they want the FCA to be about regulatory compliance FDA regulatory compliance. But I do want to get back to the Medicare reimbursement standard which we point out is set forth in the CMS Medicare benefit policy manual with respect to drugs. This is at chapter 15 50.4.2. It's very explicit that a drug once approved for sale can be prescribed for an unlabeled use and that is subject to reimbursement if that is the medical standard. But counsel in that in that situation FDA knows what the drug is that's that it is approving. If I understand relators allegations here it is that the agency was duped into approving a device had it known what the device really was it would have said no this is class 3 device we can't approve this as a class 2 device. So your honor I'm glad you asked that question because the the allegations are exactly the same in a drug off-label use claim. In each case the allegation is the intended use that they sold to FDA was one but once they got the approval then they marketed it to the doctors for a different use that's the off-label use. But I thought the relators theory was that the device that was approved could only be used in the cervical spine even though they convinced the agency to approve it thinking that it was going to be used in a lower part of the spine. Isn't that the relators theory? Your honor relator himself this morning acknowledged that that could not be said as a categorical matter because as he Smaller, larger, what part, how much of the vertebrae has to be removed all of these are very patient-specific things and that's why FDA approved it knowing the dimensions. But doesn't that also depend on on the angle of the spine at the portion at which the device is to be inserted and if they didn't submit a photograph or a diagram of the device how is the agency supposed to figure that out? Well your honor although relator has not submitted the entirety of the 510k submission the 510k submissions run hundreds of pages long with specifications about the device and so again relators theory is that nobody knows what they're doing except for the later. The doctors don't know what they're doing because they're just taking something that was given them and this court in the Cofasso's case said that Iqbal's standard of plausible allegations applies to the FCA and it is implausible that a doctor would wait until he is ready for surgery standing over the patient to read the indications on a label. The doctor will have studied the label before he goes into surgery. It's also implausible that FDA did not look at the dimensions of the dimensions were called out explicitly. But counsel we're at the pleading stage of the case and it seems to me this is the weakest part of your defense. This is the strongest part of the relator's claim that that there just that there is enough here that is plausible to at least go forward with some discovery which is what you were reciting to me to disprove what the plausibility of the relator's allegation. Your honor what what I'm saying is that where the relator's theory depends as this one does because there are two elements of reimbursement under CMS standards. The first is that it's been cleared and the second is that it's used as medically necessary. They want to knock out the first say this hasn't been cleared when we have in the record the documents in which FDA did clear your position that they have to show both so that if they show if they show that they can't meet one uh if they meet the other that's not good enough. Well your your honor if it if it was not if the device was not cleared for sale it wasn't lawfully uh something that could be marketed then that you would never get to the second one. Well that's what I understood the statute to say. But the but the fact is that these devices were cleared and the relator is going to ask a jury of laypersons to say FDA's clearance that doesn't count. Well but if we if we were to conclude that the only reason they were cleared is because your client misrepresented things then can't they state a claim? Your your honor I go back to the can just say anything I mean. No your your honor what I go back to the Buckman case because the Buckman case also involved spinal implants and there was also an allegation that that the company had initially tried to get it cleared for the spine didn't get it cleared for the spine they broke it up into components and said well it's going to be used for the long long bones in the that the defendants went on and only marketed it for use in the spine and the supreme court in Buckman said that is not a theory that a private plaintiff can assert when in order to prove liability they would have to effectively negate the approved the clearance that FDA made this idea of FDA was defrauded in clearing it is one that FDA has plenty of authorities available to it to enforce and the statute FDCA says that only the United States may bring a suit to enforce the FDCA and and the Supreme Court said that means if the cause of action depends upon negating the the effectiveness of FDA's clearance that is one that a private party cannot bring and we know from this okay we've taken your overtime so I want to find out if either of my colleagues have additional questions do you have any additional questions Judge Tallman okay then your time we've taken you five almost six minutes over so we're going to go back for rebuttal thank you good afternoon your honors may it please the court my name is Sam Cutter here we have Medtronic claiming that we're trying to substitute in our judgment for that of the FDA in fact if we took this case to a jury we would not be asking them to substitute in judgment on a device simply asking whether the FDA was deceived in the approval process and we have no record if the agency has taken no action and if Buckman says what council represents it says then why why are you able to bring this claim of fraud on the agency your honor I do not believe that Buckman stands for the proposition that a private plaintiff or that a relator is preempted because the false claims act provides its own basis for liability false claims act relators have their own prerogative to pursue fraud on public agencies whereas the FDA actually does not have the standing to bring a false claims act case and a private plaintiff doesn't have the authority to pursue fraud on the FDA as such what we're saying is that false statements made to the FDA make these claims for reimbursement false so we're not enforcing the FDA if such a that would be prosecuted on behalf of CMS or its local delegated authority who pays the claim when it but it would be a claim that's brought in the name of the United States well certainly your honor which we are also as a camera later here we are proceeding on behalf of the United States so we're here to enforce fraud on the agency that's the problem I'm having I think I understand the distinction you're trying to make but I'm bothered by the fact that neither the FDA itself nor the Department of Justice have shown sufficient indignation to become involved either in this case or in some other forum to remedy the alleged fraud your honor first of all while the Department of Justice has declined to intervene in the case they have also not moved to dismiss the case which is department policy to do if they do not believe the case is meritorious so we think the Department of Justice position is that the case is meritorious but they simply have limited resources to pursue it as for the FDA we have no record of FDA knowledge about these allegations there's simply no record of that and so we can't read into what the FDA has or hasn't done the FDA has no authority to say what Medicare should or should not pay and I would look back to this court's decision in Campy versus Gilead in which the court found that defrauding the FDA a copy of your complaint no the relator is required to provide a copy of an initial disclosure to the Department of Justice justice and you don't know whether justice gave it to FDA or not no your honor we don't know okay so we're also not talking about garden variety off-label use here an off-label use is when a drug or device has been tested and approved and proven to be safe and effective for its intended use but that never happened here so off-label use is a doctor's decision to creatively say we know this product is safe and I'm going to apply it in this other fashion but it's not up to a manufacturer to say well this off-label or this other use that we haven't tested is going to be okay it's not legal for a manufacturer to begin selling a device for a use that it has never tested or approved so I'm still a little bit hung up on Buckman so tell me why I mean Campy's the Ninth Circuit case Buckman's the Supreme Court case right so why why do you get around Buckman Buckman is a state law tort fraud case and so it's an entire Buckman is essentially case about preemption in which the field of device regulation is occupied by the FDA's monitoring and approval process so a product liability claim saying that a device was fraudulently approved and therefore the plaintiff has been injured is different than saying there was a lie and deception that happened here and that undergirds a false claim for payment so we also have no reason to think that the FDCA would preempt the False Claims Act they should be equivalent and they have their own special fields of what they're supposed to regulate so I don't think that is the congressional intent that the False Claims Act should be circumscribed by the FDA. I would also like to address the new devices that council brought up which have been cleared for use in the cervical spine I try to do it in two minutes unless my colleagues have questions okay your honor thank you first of all those uh new devices um were recently cleared there's no retroactivity so just because a new device has been cleared for use in a certain region doesn't mean that retroactively other different devices should also be cleared the regulations say what they say and we think that they don't apply to those devices anyway and we also don't know if Medtronic had a predicate device that was for a pre-market approved for these new devices and the other thing is that these new devices uh the labeling that Medtronic submitted says uh it's going to be used in the spine in the cervical spine in the neck so they've been up front about that there and so there's been no deception um with regards to those and finally it's an entirely different technology do we know that I beg your pardon what kind are these the same devices no your honor they're entirely different so the devices that have been recently approved function like a crank or a jack to lift your car up um you insert it into the space and it expands to the custom dimensions of the space versus the devices that we're talking about in this case are one size or they come in various sizes but it doesn't change shape or size um the surgeon inserts it into the hole and hammers it in and that's it um so that's entirely different technology and the new devices are based on this entirely different design are the new devices class two or class three they were cleared to class two which I think was um the point that council was making um however what we're saying is that we don't know anything else about these devices and they really have no bearing on the devices that are issued here because they're brand new and I think it also reflects a different um you know we don't know what the FDA is thinking at any given moment in time but what we do know is that the device we're talking about FDA has said no these are adulterated when you're selling them for use in the neck do either of my colleagues have any additional questions for Ms. Cutter I do not all right then I think we've taken you over as well but all all was good so thank you thank you both sides for your arguments in this case and it will stand submitted
judges: Tallman, Callahan, Lee